Hear ye, hear ye, hear ye. The United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Good morning, everyone, and welcome to, I guess, at least the virtual version of the U.S. Court of Appeals for the Fifth Circuit. We have two cases on our docket this morning. I want to make sure people know that. It was supposed to be three originally, but it's now two. Just a brief caution. Of course, all the standard rules and norms apply to this unique setting. I want to thank all the counsel for putting up with this obviously less than ideal setting, but we will get through it and hopefully be with you all in person live again someday soon. The only reminder is that we do anticipate and expect that any rebuttal time you reserve on the top side is, in fact, for rebuttal only, and you will not be introducing any new theories at that time. With that, we will call the first case, case number 19-30865, United States versus, I hope I'm pronouncing this correctly, Dejean, and Mr. Robert, we will hear from you first. Good morning. May it please the court, my name is Al Robert and I represent Mr. Patrick Dejean in this matter. Apologies on mispronouncing. No worries. Exactly. I appreciate the opportunity to be here this morning. I tried this case in the district court with my co-counsel, Mr. Michael Fowler. Mr. Dejean was indicted in March of 2017. The underlying conduct related to his indictment largely occurred four or five years prior. Mr. Dejean is a lawyer. He was elected to the Justice of the Peace, Second Justice of the Peace Court in Jefferson Parish back in 2009. Jefferson Parish is where Metairie is, the area located right outside of New Orleans proper. And Justices of the Peace Courts are sui generis in Louisiana in that they are pretty much self-funded and self-managed. The Justices of the Peace themselves get a small salary, I believe it's around $20,000 to $25,000 a year, but most of them do not get any sort of funding from the state or the municipality or the parish which they serve. So they've got to provide their own office space and some of them even operate out of their garages, etc. So the way that they make money is through, or the way that they earn their funding is through filing fees largely. So some of that background is relevant I think because this is not a case where Mr. Dejean was elected to the Justice of the Peace and had everything in front of them. He had to essentially create his office and fund it himself. And the other issue that I think is relevant to this court's consideration at least for background purposes, Mr. Dejean was a lawyer. I think he was around 30 or so when he took office. And whenever Justices of the Peace are elected, they have a constable that is elected in the same district. And that constable is essentially the equivalent of a sheriff and performs the same functions that a sheriff does to the district court, which would be assisting with service and then handling the garnishments and those types of things that occur. Unfortunately in Mr. Dejean's case, the constable that was elected to serve with him had been there for a long time and there was lots of friction. And quite frankly, he just was not doing what he was supposed to be doing. As a result, Mr. Dejean took over the handling of garnishments and he was not typically, Justices of the Peace are not supposed to handle garnishments. He sought assistance from multiple entities and that's how he ended up sort And as I'm sure you've seen from the record, one of the reasons that we're here and Mr. Dejean was indicted and now is serving time is because he had a gambling problem and the government put on evidence at trial that as a compulsive gambler, Mr. Dejean withdrew over $234,000 from second We obviously knew that this was going to be an issue with the jury. We filed a motion in Lemony pre-trial attempting to keep some of this evidence out or at least limiting it so the trial court, the trial judge was aware that this was an issue. And to Judge Lemon's credit, she is one of the few And she did allow us some limited questioning of the jurors of issues that we chose and obviously gambling was one of those issues. Did she allow you to ask questions, Mr. Robert? Yes, Judge. She did some initial questioning of each panel and then she gave, I believe, each side, I don't recall if it was five minutes or ten minutes. So it was not a lot of time but it was, she did allow the lawyers to conduct some questioning and that's what brings us to the case here today. And I just wanted to make the point that Mr. Dejean himself, he worked in law school in the Eastern District in the U.S. Attorney's Office. So he knew a lot of the people in that office. His wife was an administrator in the office and as a result of that, the Eastern District actually recused itself from this case and it was handled out of the Western District of Louisiana. And the reason I raise that point is that the way that federal government got involved in this case at all was because Mr. Dejean himself sought assistance from the Eastern District U.S. Attorney's Office when he was having issues with his constable. He was saying I need help and he reached out to one of the U.S. Attorneys that he knew and the FBI was ultimately sent to the second justice courts at Mr. Dejean's request because he was having trouble with the office. So the issue that is before this court and that we've raised in this appeal relates to Mr. Dejean's Sixth Amendment rights. And as you know, the Sixth Amendment provides in part that in all criminal jurors 31 and 38. Is that right? And that's what we're dealing with. So on juror 38, do you all have a waiver or forfeiture problem here? It sounds like you may not have objected in trial. Yes, Judge. And I think for the purposes of today, I'm willing to concede that the challenge number 38, I think what we were relying on was that the comments that he made after the jury was was seated. But but for the purposes of today, I think our primary focus is on juror number 31. And for practical purposes, we will waive the challenge to juror number 30. OK, so after 31, why don't we turn it up and talk about that? Certainly. I think that the what we rely upon primarily is this court's jurisprudence as it relates to impartial jurors and specifically the this circuit's case in Virgil versus Drittke, which was 446 F 3598 was a 2006 case out of this circuit. That was a habeas corpus case, a post conviction matter that was filed by a prisoner in Texas. And part of the ineffective assistance of counsel claim that he made, which was essentially recognized and granted by this court related to his counsel's failure to object to five jurors or potential jurors. This court ultimately focused on two of those jurors and the challenges that his attorney failed to make. And we reference this in our in our brief. But I think it's important because the questioning in of those two jurors in the Virgil case is, in my mind, almost indistinguishable from the questioning of juror number 31 in the present case. And I think it's worth just very briefly focusing on what that questioning was. There were two jurors in Virgil. There was Sumlin. The defense attorney essentially said he was asking the jurors of the panel if they had any experience with law enforcement in their family. And Mr. Sumlin responded, essentially, my concern would be repeated offenses, a pattern of past behavior, repeated offenses. The attorney responded, OK, but have you had any association in the past with police officers in your family or friends? Mr. Sumlin responded, yes, I have relatives. I'm just saying from their experience that they've told me about repeat offenders. And the defense attorney, so therefore you could not serve as an impartial juror in this case, Mr. Sumlin, perhaps not. Is the answer yes or no? I would say no. That was the extent of the discussion with juror number 16 or Mr. Sumlin in the Virgil case. And similarly, there was a follow-up question at the end of the panel from Mr. Sims, where the defense attorney asked, is there anything in anyone's background that would cause you not to be a fair and impartial juror in Mr. Virgil's case, in this particular case at this particular time in this courtroom? And Mr. Sims responded, yes, I don't know if it's going to be partial or impartial, but my mother was mugged and they never found the mugger. The thought keeps crossing my mind while we're talking about this, as far as assault on an elderly person. So it's weighing on me because of the fact that they never did find the person. I'm thinking about that. And the attorney responded, would you call it, would this cause you to be a juror who could not be fair and impartial in this case? Mr. Sims said, yeah, I believe so. Not believe, or is it so, was the defense attorney's response. He said, yes, I do believe so. So critically, this court in the Virgil decision cited precedent from Hughes in the Sixth Circuit and the Fifth Circuit decision in Nell, and neither benign person ever stated that they would be able to render a fair and impartial verdict. And as I said, this was a habeas case, so it was the Strickland factors that were applied, which is, I think, a greater standard or view than we're dealing with here. And the court found it had merit. It said that, and I'll just say it, this court held that Simons and Sims' unchallenged statements during voir dire, that they could not be fair and impartial, obligated his counsel to use peremptory or forecast challenges, and not doing so was deficient performance. And the critical case, or the critical holding, I think, that applies here is that this, and this is directly from the Fifth Circuit's decision, the jury box is a holy place. Our criminal justice system is predicated on the notion that those accused of criminal offenses are innocent until proven guilty and are entitled to a jury of persons willing and able to consider fairly the evidence presented in order to reach a determination of guilt or innocence. They found that Mr. Virgil was denied these two basic principles, and whenever his attorney failed to challenge these jurors, and this is a direct quote, there was little doubt that if he had preserved these errors, that such an error would have been sustained by the Texas courts on direct review. And if you look at the questioning of juror number 31 in this case, it was nearly identical to the questioning of Mr. Sims and Mr. Sumlin. Her reasons were identical. Don't you think that the underlying reason for a jury doubting whether they can be a sufficient juror and the objectivity matters? She just said that gambling was silly, where these other two potential jurors said that the mother had gotten beat up and the family was sort of preaching about repeat offenders and recidivists. Don't you think there's a big difference between the Virgil case and your client? I don't, quite frankly, because the issue in Virgil, certainly with Mr. Sumlin, is simply saying that he knew that his law enforcement family members talked about repeat offenders. He didn't make any finding about that being an issue. In this case, although that he essentially said the same thing when questioned, that because of his discussions with family, that he would find it difficult to be impartial. And that's the same here with juror number 31. She said it was silly, but she also said, I know family members that have had trouble with it. She said, in other words, you've had, and let me read it directly. I think it's a silly way to spend your money, but that's what you I've had family members in the past that have had issues with gambling. So I think she's taking it back in the same direction that Mr. Sumlin did. She's identifying with the problems and the issues that her family members had. That language, though, had issues with gambling as sort of a leaning towards criminal liability. It seems to me, I think Judge Pond's saying the same thing, is in Virgil, you've got sort of a presumption of criminal liability or bias towards criminal liability. Your client being potentially silly, that does seem a little different. Well, I think it's related to the problems caused with gambling. And I recognize that the silly comment on its own is not what we're hanging our hat on. We're not complaining here because she said it was silly. We're here because she said that in addition to or but, she recognizes the problems that it's caused with family. And we had limited time to question. And that's the issue, is that there should have been some additional follow-up. Did you ask for additional time? Did you ask Judge Lemon for additional time? We did, Your Honor. In the case that was followed up on the page following in the record, she was saying you need to wrap it up, Mr. Fowler. And there was not time directly requested as to this juror. But I think that's one of the issues that we raise in our briefs, is that the whole jury selection got somewhat compressed because of some significant miscommunication between the court and the jury administrator. And on their judicial temperament, some judges are fine. They just sort of roll with the punches. Judge Lemon is a very, she likes to keep things on schedule. And I think she was frustrated and agitated by the way that things had happened with the jury administrator. And it was clear that she wanted to get this. You think because they had to call the jury? That's what you're referring to? Well, in two parts, Your Honor. It was the jury questionnaire and the biography information that's provided to the judge and the attorneys whenever the panel comes in was delayed for some reason. And the jury administrator was not able to provide that to us until approximately 45 or 50 minutes after the judge was ready to get started. So we were delayed just from the start. And then the jury administrator had under Judge Lemon's understanding that they had already had already screened for people who had caused our hardship problems. And obviously that didn't happen. And so at the end of the trial, that's when the juror 38 issue reared its head. And it just all of that's to say that this was not a smooth jury selection. And I see that I'm out of time. Thank you, Counselor. You preserve time for the panel. Mr. Lerman, we'll hear from you now. Good morning. May I please the court, Dan Lerman for the United States. This court has repeatedly stated that a trial court's determination about a juror's impartiality is entitled to great deference. That is because that determination is based upon a host of on the ground factors, including a juror's demeanor, sincerity, credibility, tone of voice, and body language. The district court made such determinations here. The defendant's primary argument on appeal with respect to juror 31 is that she agreed with defense counsel's suggestion that she shouldn't, quote, sit on the case. But the district court found that the juror made that statement in response to defense counsel's leading questions and out of a desire to end the questioning. The court therefore concluded that the juror's statement did not undermine her initial indication that she could be an impartial juror. Mr. Lerman, you just sort of gave us your reconstruction of the district court's rationale. Where in the record did the district court express that reasoning that you just explained to us? In other words, that it was out of a desire to cut off questioning. The out of a desire to cut off questioning, your honor, was given in the court's order denying the based upon the juror's bias. Thank you. During the war gear itself, what the court said was that I think you're mischaracterizing the record. The juror said that she wasn't going to waste her money. She didn't care what other. I guess that's that was a thrust of my question. As I read the district court's colloquy, Judge Lemon says that wasn't the context of her testimony. She said she wasn't going to waste her money. She didn't care about what other people did. And my only concern about that was that that doesn't really get at the full context of the answers. I mean, the juror said that. Yeah. But the juror also said, well, possibly I won't be able to be fair and then agree with the with the defense counsel that she shouldn't sit on the jury. So, I mean, I guess my concern there was, well, did the district court really misunderstand the between defense counsel and the juror? I don't think so, your honor. I understand that the court didn't fully articulate the reasons in real time to the extent that she did in her order denying the mistrial. So so I acknowledge that. But I think a lot of this is apparent from the record. I mean, in the judge's order, she said that she made that determination based upon the totality of the circumstances, the details of the exchange and the demeanor. Refer expressly to the demeanor at the time. But if you look at the questioning, you can see that after the silly comment, which defense counsels. The questions do take a very leading tone, right? And the and she said, so you're saying, you know, you might not be able to be fair and the jury response possibly. So you're telling me that because of that, you shouldn't sit on this jury. And she says, yes, I think it's apparent from the record that those are leading questions. And the court was therefore, you know, aware of that. Let me ask about this rationale that the district court cited and you repeated here, which is that this juror was anxious to end the questioning and so just said whatever it took to satisfy the lawyer. Reading at least the cold transcript on appeal. This is not a lot of questions. This is a pretty short colloquy. I don't really understand this notion that she was anxious to end what appears to be about 60 seconds of questioning. Right. I agree, your honor, that it doesn't look like an inordinately fulsome number of questioning. I do think defense counsel did have sufficient time to ask all the veneer members questions. And so I just wanted to make that clear. But I understand your honor's point. I think that may well be something that is not necessarily apparent from the cold record. That is something that this court has stated. One of the reasons why courts grant such deference to a trial court on the ground determination, because it could be based upon factors such as demeanor that we can't see here. But here's my concern, though. You know, these questions might have been mildly leading. I'll give you that. I don't think they're the most aggressive questioning in the world. I don't think she felt badgered necessarily. But at the end of the day, the counsel of the juror says or agrees that they shouldn't sit on this case. Why is that not? That's quite a statement or quite an agreement concession. Why is that not the basis or the justification for at least some rehabilitation? For two reasons, your honor. The first is the juror wasn't asked by defense counsel, given the views on gambling that you just expressed, you know, would you be able to decide the case based upon the evidence deduced at trial? That is the standard for impartiality. The juror was asked in a somewhat leading fashion. Given your views, you shouldn't sit on the case, right? Well, the juror doesn't know the standard for whether or not she should sit on the case. The juror knows what she feels and the judge knows the standard, and it's up to the judge to apply that standard. So the juror's statement here that she shouldn't sit on the case should be discounted by the judge improperly. So because that's not her call to make, because she doesn't know the legal standard. The legal standard is can you decide the case based upon the evidence? The court concluded after the colloquy that there was no suggestion here that she couldn't use in part because she had her initial indication that she could decide the case based on, in part because the, you know, putatively contrary suggestion that here was really ambiguous and after, I think we could agree are at the very least somewhat misleading questions. But the main point is that the court, it's up to the court to decide that, not the juror. I do think that's one of the distinctions, Your Honor, with the Virgil and Hughes cases that were cited by defense counsel in this reply brief here. There are several distinctions, including factual ones, but there, you know, the potential jurors, sorry, the actual jurors in those cases stated that they couldn't be impartial. They didn't just say they couldn't sit on the case. They stated that they couldn't be impartial based upon the particular facts of the case. So those cases were different because as one of the judges mentioned this morning, one of the jurors said that her mother was mugged in a case that involved an assault against the elderly. And therefore she could not be impartial. Another said that here, jurors asked, could it affect you in an unfair way? That's true. But what unfair was used, which obviously is the same thing as not impartial. I agree that unfair is similar to impartial. I'm not disputing that. It doesn't, I don't think, fully capture the standard, which is, can you decide the case based upon the evidence at trial, which is a standard articulated by the courts repeatedly. And also the court, her response there is possibly, that's the type of ambiguous statement that this court and others have found not to render a jury unqualified. Remember this court and others have repeatedly said that, you know, an initial inability to be even impartial courts have said, just, you know, favoring one side or the other does not render you unqualified so long as you can decide the case based on the evidence. What do you make of cases like, I think it was Hinojosa where a juror said that she was not, quote, not sure if she could decide a case based on the evidence. It seems like there, we said that there would be, it would be important to have rehabilitation questions. Given a not sure response here, it's less equivocal than not sure. She's outright saying that she shouldn't sit. Well, she said she couldn't sit, your honor. She didn't, she didn't unequivocally say she wouldn't decide the case based on the evidence. Also just, you know, for the, I know the courts. Let's say maybe it's not stronger than, than similar. You've got, it's possible that she might be fair to me, kind of similar to not sure if they could be fair. Yeah. I mean, possible is possible and that's not sure. I mean, my answer, your honor, would be that every case is different to begin with all three of those cases, Hinojosa, Celestine, Epidoka, this court affirmed the seating of the jurors. So I just want to make clear that support of her. But correct me if I'm wrong, you probably know these cases better than I do. Didn't we say that the rehabilitation questioning after the fact was important, given those more equivocal responses? I don't want to misstate the record. I, the court did rehabilitate. And I think the court, and then, and then this court, I think pointed to that. I don't believe this court said that the rehabilitation was necessary and that absolutely rehabilitation there would have been biased. But, but I, you know, but, but your point is in those cases, there was, there was rehabilitation. And for whatever reason we said that that was, and we said that it was important and it is important. Right. I agree. And the cases I think are just different on the facts. And that's, that's the case for all these. And I'll return to Virgil and Hughes in a minute, but in Celestine, I mean, the juror knew the granddaughter of a murder victim and the prosecuting attorney and said that it would be very difficult to be impartial. And in Apodaca, the juror worked for the FBI, her husband worked for the FBI and said that she would favor the prosecution because she knows what goes into presenting a case to the grand jury. And then in Hinojosa, you had a juror with a somewhat drug problem saying that might affect her ability to be an unbiased juror in a drug case. Here, the juror did not express any views on the crime at issue or alleged, which is a fraud crime. She did not say that she would be biased in favor of the prosecution. And she did not say it would be difficult for her to decide the case. The contrary, she suggested at the beginning of Ordear that she could do that. She did suggest that she had a family member with gambling problems and that gambling would be a silly way to spend your money, but that doesn't rise to the level of bias. Once you, and then she had the response to the leading questions about sitting on the jury. And we discussed that, but once that drops away, you're left with the initial questions about whether you could be impartial to which she suggested she could, and you're left with the silly statement, which defense counsel suggested that he was not hanging his hat on. So once those drop away, there's really no reason here for rehabilitation. And I was distinguishable from the facts of the other cases where there was a greater, at least initial cause to be concerned about the juror's ability to be impartial. Turning to the Virgil and Hughes cases, which were raised in the appellate for crime brief. And then here today, those are distinguished for distinguishable for several reasons. First of all, the court in Hughes, and then this court referenced this in Virgil made a point to the fact that the juror there and Hughes didn't answer any of the initial questioning about whether or not he could be impartial. And in Virgil, the court against that, that there was no statement by the juror there as in Hughes, that he could be impartial. That's different from this case. The facts are also different as I got to, which is the juror being mugged and the family relationship with law enforcement. And the third difference in both of those cases is that as defense counsel mentioned, they are ineffective assistance of counsel cases. I understand that there are different standards involved, but one of the key points for this court in Virgil was that it discounted the state's, what I call post hoc justifications for why the juror may or may not have been appropriate. Here, what we have was we had a contemporaneous challenge to juror 31. We had the district court's ruling on that the court's written order in response to a motion for a new trial that referred to the totality of the circumstances, the context of the questioning and the juror's demeanor and credibility. That is the type of thing that this court gives extraordinary deference to and that this court has stated is reviewed for manifest abuse of discretion. And in Hughes, we had the added point, which is I think persuasive here and important here, which is the court said that the statements in Hughes were not the result of any leading questioning at all. And it referred to the Supreme Court's decision in other cases that said district courts are well within their rights to at least discount a juror's response to leading questioning. I understand Judge Ho your view that this wasn't an inordinate amount of questioning, but you could see that it was leading. And as I stated earlier, the main point was that it doesn't even get to the standard for being seated on a jury. You can't just ask a juror, should you be seated on this jury? And then she says, no, you need to get to the reasons for that and whether or not it affects your ability to judge the case based on the evidence. And defense counsel didn't do that here. Defense counsel did have an opportunity to ask questions. The defense counsel returned to juror 31 several points during the trial and mentioned what he at the time thought was her statement that gambling was evil. That ended up not being the question in her statement. But defense counsel felt okay asserting himself and returning to this question. And just one point of clarification for Judge Clement, I'm not sure if this got lost, but the issue with the jurors returning for hardship reasons and losing three and getting three more that all happened after juror 31. So that's relevant to juror 38 selection. But that didn't happen until after juror 31 was already selected for sitting on part of the what you said Judge Lemon was frustrated or something. I didn't see any that's not in the record as far as I could tell your honor. There was the part about the hardship things that was in the record, the part about the questionnaire and the jurors not coming up in time. That's not evident to me anywhere in the record. I could be wrong, but I didn't see. If you look at the transcript, the judge conducted herself a fairly extensive ordeal of each of the three groups of your members asking them the introductory questions based on their answers. The judge asked her own questions. So if somebody indicated that they did have, you know, a view on justice of the people's courts or garnishment wages or family members who work at casinos, the judge, Sue Esponte, would engage in a board here with them would follow up. She would follow up the judge's questions. I mean, the lawyers questions on defense. Yeah, there was a follow up. Usually it would be after. So the judge would ask all the questions and the defense counsel got up and chose to focus on a few things. Usually he focused on either their views on gambling, I think perhaps on some other things, if that came up either in the questionnaire, which is not in the record or in their initial board here. But but the defense counsel did follow up and he was able to go through every every juror and ask the questions that he wanted. And then after that, what happened was defense counsel would state his forecast challenges to each of them. And then the court would rule on that. And then they would go through and do their correctors. So the bench or an open court was the individual questioning of the jurors by the lawyers at the bench or an open court. I believe it was an open court. I could be wrong, but I believe it was an open court and defense counsel could correct me if I'm shaking his head. OK, nodding his head. Yeah, because and you could see this from the tenor is that there were some the questions were given to some of them. As a group, you know, they were brought into the three groups. They gave their responses. And then if one of their responses triggered a further inquiry, you could see that you could read that the court then addressed particular questions to the particular jurors and marched through them all. And then defense counsel marched through them all. And and then the prosecution asked fewer questions of the particular jurors. But there was, I would I would submit adequate ability to ask questions. This court and Supreme Court has also reiterated that there's no hard and soft rule about how to conduct voir dire. That's another reason why courts give extraordinary discretion to the district court. I didn't see any indication here that voir dire was anything but thorough and fair. And as I noted, the defense counsel went back to the well and juror 31 several times here stating that, you know, she said gambling was evil. She said gambling was evil. She really needs to be dismissed. The court, to be fair, as I think defense counsel said, the court at one point just say, OK, you know, you could take that up on appeal, you know. So eventually the court did say, you know, I've made my ruling there, but that's what courts do after they make a ruling. And then he was able to make another objection in his motion for a new trial where the court then issued a written order on that and juror 38 as well. So I would submit that this was the parties here had an adequate ability to suss out potential bias during voir dire. And the key question here is really whether the district court manifestly abused its discretion in denying the four cause challenge to juror 31. And I would submit that the court did not do so. Thank you, Mr. Lerman. Thank you. Mr. Robert, you've got five minutes for rebuttal. Thank you very much. I think that the discrete issue in front of this court today is absolutely the trial court is entitled to great discretion, to credibility of witnesses and make decisions on their qualifications to sit on the jury. And the issue becomes when it's not evident in the record from the cold record, whether or not, or let me restate it differently. When the cold record raises questions about the suitability of that judge and that juror, a potential juror to be a fair and impartial juror, it's understandable that this court will give some discretion to the trial court to make decisions that are not plainly evident from the record. But I think, Your Honor, Judge Ho, you made the point in all of the cases that the government cited in their reply or their opposition brief, Hinojosa, Celestine, Apodaca, all of those cases, there was extensive questioning, much more so than what occurred here in this case with Juror 31. And so what the government is, in effect, relying on is... What do you make of the government's response that although there was, in fact, greater questioning or rehabilitation questioning there, there's no language in our cases saying that that was required, that there would have been relief granted had there not been the rehab questioning? I don't think that this is something that requires a bright line rule, and I don't disagree with that. But I think that the record has to show that there was sufficient questioning that would permit the court to make those inferences. And I don't think that was the case here. And the court, the government relies on the initial questioning that was made to the near when the court asked the multitude of qualifying questions when it brought each... I think there were three groups of... The first one was 25, and then there was 15 and 15, if I recall, or something along that side. And she had the page of questions that she'd go through. Do you understand that you cannot draw any inference of guilt, et cetera? And one of those 20 questions or so was the question, will you firmly put aside any feelings of prejudice, sympathy, et cetera? And there was no affirmative statement from juror number 31 that she would do that. She was essentially, I guess, nodding her head. I think we were all doing our best to monitor that. But the issue becomes, if you look at this entire voir dire in its entirety, Judge Lemon was very attentive to this panel, and she asked questions. And if you go through this transcript methodically, any juror that raised a response similar to that of juror number 31, the judge granted our for cause objection, or she followed up and rehabilitated the juror. What's the, in your view, Mr. Robert, what's the closest juror to juror 31 that was dismissed for very briefly, if I can point it out? I mean, I'm looking for somebody who's a little bit less definitive than the one who said gambling is evil. Well, I guess what I would point to is juror number 38, Mr. DeMare. And he was speaking about, and this is on page 647 of the record, as you've probably heard, there's testimony, there will be testimony. I don't mean to interrupt you, but juror 38 wasn't dismissed for cause. No, he was not. But the court, he made similar responses to juror number 31. And the court actually followed up and asked questions to rehabilitate. So this is the transcript. The court, let me ask one follow-up question. The idea and the reason for all these cases is we need to determine whether you can be fair. And he says, right. And the court says, so can you listen to what happens here in the courtroom and then make a determination whether or not the government has established the guilt of this defendant beyond a reasonable doubt? And he responds, I feel like I should be. Yes, I'm sorry. So you're saying she did that with respect to 38. She didn't do it with respect to 31. And there's the reversible error. That's right. I understand that the judge says that she based it on the totality of the circumstances. I'm just if you look at the full transcript of the thing, this is something that this juror fell through the cracks of Judge Lemon's attention. It's what happened. She missed it. Because I assure you, she would have followed up and asked questions like she did with Mr. DeMera and she did with multiple jurors otherwise with juror number 31 if something hadn't happened that she could track to her intent. And as a result of that, Mr. Dijon had a jury that we don't know was impartial. His six-minute rights were violated. And that's why we ask that this be vacated and remanded. Thank you all to both counsel for a good argument. The case is submitted.